RECEIVED
MAR 1 7 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Raquel Y. Gordon, | ) |
| Plaintiff, | ) Civil Action No. 05-1926-RBW |
| v. | ) DATE: March 17, 2006 |
| Carlos Gutierrez, Secretary of Commerce, *et al.*, | ) |
| Defendants. | ) |

**OPPOSITION TO DEFENDANT'S COMBINED REPLY, AFFIDAVIT IN SUPPORT THEREOF AND SECOND REQUESTS FOR JURISDICITONAL DISCOVERY AND SANCTIONS**

**Venue is Appropriate in the District of Columbia**

Venue is coterminous with jurisdiction. It is completely proper for a federal employee to bring Title VII, 42 U.S.C. § 2000e, Prohibited personnel practices claims proscribed by Title 5 U.S.C. 2302(a)(23), FTCA claims pursuant to 28 U.S.C.S. § 1346, Privacy Act claims, and Whistleblower Act claims to the district court of the District of Columbia. See Plantiff's Opp. to Agency's Mot. For Diss. and Change of Venue.

It cannot be emphasized enough the USPTO "resides" in the District of Columbia for purposes of proper venue and jurisdiction for this complaint since the District of Columbia is the proper venue for all federal government agencies. Id. Plaintiff submitted scholarly, legally correct, and factually correct arguments supporting why this case judicially must proceed in the District of Columbia. In light of those arguments, it is obvious the USPTO is merely a "puppet" in which the Department of Commerce and

Office of Personnel Management, parentally pull all the strings and promulgate all the rules and regulations regarding USPTO functions.

Plaintiff hereby submits supporting evidence which leads her to believe the Office of Public Affairs was located in Washington, D.C. around the time the issues in this case initially arose. See "Media Advisory" attached at Ex. 1. Even if the Office of Public Affairs was not physically located in Washington, D.C., the USPTO maintained sufficient contacts in Washington, D.C. since the office consistently used a Washington, D.C. address.

Further, through its own Affidavit, the USPTO admits it maintained Washington, D.C. addresses through May 1, 2003. See Def. Combined Reply, Ex. 2, Hassett Decl. at items 3-5. It is quite obvious when Plaintiff's claims arose the USPTO maintained sufficient minimal contacts in the District of Columbia in areas involving employee related matters as well as general patent related matters which touch and concern Plaintiff.

**The District of Columbia is the Most Convenient Forum for the Parties**

The District of Columbia is the most convenient forum for all the parties involved. In November and December 2005, the USPTO agreed to have several of its employees, including Howard Goldberg, deposed in conference rooms located at the law firm of Williams and Connolly, 725 12th Street N.W., Washington, DC 20005. Howard Goldberg is a named defendant in this action. Depositions of Howard Goldberg and other USPTO employees were taken November 28, 2005, November 29, 2005, and December 8, 2005 for MSPB Case No. DC-0752-05-0759-I-1. The witnesses and their Counsel, Sonya White, were all heard at one time or another, to indicate they did not have any problems

arriving on time since their chauffeured arrivals and departures made arriving and leaving convenient for them.

In all practicality, the current Woodrow Wilson Bridge Construction project is extremely likely to interfere with Plaintiff's ability to appear timely in a forum located in Virginia. In recent attempts to go to Virginia, Plaintiff found it exceedingly difficult to maneuver onto the Woodrow Wilson Bridge during rush hour in its current phase of construction. Because Plaintiff is Pro Se, she has had to make filings to this Court in person instead of electronically. It would be near impossible to proceed with this case if this case was transferred to Virginia due to the extreme daily traffic delays that are highly likely to make it difficult to personally file documents in the Virginia court system. Hence, transferring this case would be extremely prejudicial to this Pro Se Plaintiff.

Plaintiff is currently representing herself under a mental impairment and financial constraints. As a pro se plaintiff, it is believed Plaintiff's physical health will continue to be compromised if Plaintiff's self-representation is combined with the extreme traffic situations caused by the Woodrow Wilson Bridge delays. Further the travel costs are likely to exceed what Plaintiff can afford since she is not receiving any unemployment or disability compensation.

Plaintiff also believes this case is of significant concern to congress, and congressional subcommittee members on Capitol Hill since it involves the alleged hiding of patent applications in an effort to retaliate and discriminate against a Primary Patent Examiner. It is believed some of the proposed witnesses will be called from the Office of Personnel Management, Department of Commerce, Washington, D.C., Howard County Maryland, Potomac, Maryland, and Southern Maryland. It is believed a case moved to

Virginia from this District of Columbia Court will be inconvenient for witnesses in support of Plaintiff's case.

**Notice of Complaint Acknowledged by Defendant**

On November 29, 2005, when Howard Goldberg was deposed for MSPB Case No. DC-0752-05-0759-I-1, Mr. Goldberg acknowledged receipt of this District Court Complaint. When asked if he was familiar with whom any EEO complaints Plaintiff had filed in the past were against, Mr. Goldberg replied under oath "I believe most recently you[1] have file a claim against myself, Peggy Focarino, Nancy Lee, John Barlow. There may have been others." See Goldberg Affidavit at 33, lines 13-15, attached as Ex. 2. Also in connection to this complaint, he later stated "I just received a notice myself, so, yes, I am aware you have filed against members of the agency." See Goldberg Affidavit at 34, lines 3-4, attached as Ex. 2.

In light of Plaintiff's previous arguments, Plaintiff made a good faith attempt to put the defendants on notice regarding all discoverable complaint issues and was obviously successful.

**Clarification of Inadvertent Copy Malfunction Likely Cause for Missing Pages**

To clarify Plaintiff's previously established position regarding the possibly missing pages, the Plaintiff did not indicate the Clerk of the court caused any pages to be missing.

---

[1] Mr. Goldberg's reference to "you" referred to Ms. Gordon who was representing herself pro se and conducting the deposition in that case.

The Plaintiff indicated she filed a complaint containing an original signature. Further, simultaneously, she filed a copy of the originally signed complaint. She further made several copies of the complaint for serving on other parties. It is believed the originally signed complaint may be filed with the court with all pages in tact. On February 17, 2006, Plaintiff inquired with the court regarding where the two filings were located after being filed. A clerk in the file room indicated the original goes to the Judge and a copy is left in the file. Plaintiff only indicated she has a good faith belief that she filed a complete original complaint with the court. It is possible the *copy* of the original complaint may have inadvertently been caused to miss pages during the copy process prior to the filing with the court (with emphasis). Nevertheless, all of the information on any possibly missing pages is entirely discoverable. It would be extremely prejudicial to use Plaintiff's good faith attempt to serve defendant's as a basis to dismiss this case.

Further, Plaintiff would like to clarify and emphasize, November 14, 2005, parent's house caught fire and they lost the use and enjoyment of their home of all of their possessions due to fire, smoke and water damage. The day of the fire they lost one family dog and December 31, 2005, they lost the other dog. November 14, 2005 through the middle of December 2005, Plaintiff assisted her parents in finding some place to live and emotionally assisted them through their traumatic experience. The Plaintiff was unaware of opposing counsel's holiday schedule when she faxed the missing pages to him. Plaintiff merely faxed them at her earliest opportunity to respond in the midst of all of her personal chaos. These facts are supported in Plaintiff's February 17, 2006 motion. See Plaintiff's Opp. to Agency's Mot. For Diss. and Change of Venue, p. 3.

**Defendant's Counsel Continues in Bad Faith to State He Made Proper Attempts to Contact Plaintiff**

Plaintiff briefly states, with respect to the EEOC Order attached, in December 2005, there was no allegations that there was any issue with Plaintiffs correct phone number 301-283-6251. See EEOC Order attached to Def. Combined Reply, p. 1, ¶ 4, lines 7-8. Plaintiff's correct phone number (301-283-6251) has been on file with the USPTO since the mid 1990s. Opposing counsel never attempted to contact Plaintiff at 301-283-6251. And, by Agency's own admission to the EEOC Judge, the Agency had Plaintiff's phone number and was able to successfully use Plaintiff's phone number in December 2005 when opposing counsel insists he had no way of contacting Plaintiff (with emphais). Id. at ¶ 4, lines 1-8. It is certain Defendant's continues to in bad faith to hide the fact he did not try to contact Plaintiff in good faith regarding obtaining allegedly missing pages which he did receive by facsimile December 24, 2005.

**Second Request for Sanctions**

Plaintiff again request sanctions regarding the submission of James J. Matthews' Affidavit and supplemental affidavits submitted to support opposing counsel's dispositive motion.

It is impossible for Mr. Matthews to have personal knowledge of USPTO's practices, rules, and operations when these claims arose since he was not working at USPTO until February 5, 2005. No reading of Plaintiff's Official personnel file could give him the personal knowledge necessary to testify on the matter of events that took place in before

It is suspect as to whether Mr. Matthews really reviewed Plaintiff's Official Personnel File (OPF). Mr. Matthews stated OPFs are sent to the National Personnel Records Center in St. Louis, Missouri when employees leave the Agency. See Matthews Affidavit, item 7. Plaintiff left the Agency effective July 15, 2005. This complaint was not filed until September 16, 2005.

If the Agency really had access to Plaintiff's OPF, it is highly likely they would have access to plaintiff's current phone number for opposing counsel's use. This request for sanctions is requested to deter Defendant's from continuing to perpetrate a fraud on this court and to make Plaintiff whole.

**Second Request for Jurisdictional Discovery**

Plaintiff contends Richard indicates that jurisdictional discovery is proper to gather facts necessary to discover any relevant information necessary to discover whether this district court in the District of Columbia is the proper place for adjudication of this case. Plaintiff contends the District of Columbia is clearly the proper venue for a case brought by a federal government employee against a federal government defendant. Though the Plaintiff has presented a very scholarly argument and provided points of authority to support her arguments, further jurisdictional discovery is an alternative to dismissal and/or transfer in this case.

## Conclusion

Wherefore Plaintiff requests the Defendant's motion to dismiss or transfer this case is **DENIED** and this case is allowed to proceed forward to a **JURY TRIAL**. Or in the alternative, Plaintiff's motion for **Jurisdictional Discovery** should be granted.

## Attestation

I hereby swear under the penalty of perjury, pursuant to 28 U.S.C. § 1746, these statements herein are true to the best of my knowledge and belief.

Respectfully Submitted,

3/17/2006
Date

Raquel Y. Gordon
6332 Southlake Court
Bryans Road, MD 20616
TEL: 301-283-6251

**CERTIFICATE OF SERVICE**

This is to certify the other party was served with the *OPPOSITION TO DEFENDANT'S COMBINED REPLY, AFFIDAVIT IN SUPPORT THEREOF AND CONTINUED SECOND REQUESTS FOR JURISDICTIONAL DISCOVERY AND SANCTIONS* on the date indicated in the following manner:

**(Via Facsimile and First Class Mail)**

Alan Burch
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Fax: 202-514-8780

Raquel Y. Gordon

3/17/2006
Date

Exhibit 1




Office of Public Affairs
Washington, DC 20231
www.uspto.gov

**MEDIA ADVISORY**
CONTACT:
Kim Byars
703-305-8341

**February15, 2001**
01-10

**UNITED STATES PATENT AND TRADEMARK OFFICE SPONSORS E-COMMERCE TRADEMARK SEMINAR**

In a forum, sponsored by several Chicago-area law firms, associations and law schools, the United States Patent and Trademark Office (USPTO) will present the agency's trademark initiatives for 2001. It will be a unique collaboration between the USPTO and senior law firm and corporate trademark practitioners. The program will permit high level USPTO staff and senior law firm and corporate practitioners to share information and ideas, with the goal of ensuring that business needs are met as the USPTO transitions to a new e-commerce environment.

Anne H. Chasser, Commissioner of Trademarks at USPTO will deliver a major address focusing on the USPTO's plan to implement a totally electronic work processing system on Friday, February 16, 2001, in Chicago. The program is also being sponsored by Bell, Boyd & Lloyd LLC and Brinks Hofer Gilson & Lione.

| | |
|---|---|
| WHO: | United States Patent and Trademark Office |
| WHAT: | Timely dialogue---The Trademark Office Goes E-Commerce |
| WHEN: | Friday, February 16, 2001<br>12:30-5:00 p.m. |
| WHERE: | IIT Chicago-Kent College of Law<br>565 West Adams Street<br>Chicago, IL |

###

Exhibit 2

IN THE USA MERIT SYSTEM PROTECTION
WASHINGTON REGIONAL BOARDS

- - - - - - - - - - - - - - - - - - -X
RAQUEL Y. GORDON, :
Appellant, :
v. :Case No.: DC-0752-05-0759-1-1
U.S. PATENT & TRADEMARK OFFICE, :
:
Agency. :
- - - - - - - - - - - - - - - - - - -X

Tuesday, November 29, 2005

Washington, D.C.

Deposition of

HOWARD GOLDBERG

witness, called for examination by appellant, pursuant to notice, at the offices of Williams & Connolly, 725 12th Street, N.W., Washington, D.C. 20005, beginning at 9:22 a.m., before Sharon Mitrothanasis, a notary public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCES

FOR THE APPELLANT:

RAQUEL Y. GORDON, PRO SE
6332 Southlake Court
Bryans Road, MD 20616

FOR THE AGENCY:
SONYA WHITE, ESQUIRE
USPTO Office of the General Counsel
600 Delany Street, Suite 10A41
Madison Building
Alexandria, VA 22314

ALSO PRESENT:

William Luther

* * * * *

CONTENTS



| WITNESS: | EXAMINATION BY COUNSEL FOR THE APPELLANT | AGENCY |
|---|---|---|
| Howard Goldberg | 3 | |



* * * * *

EXHIBITS



| EXHIBIT NUMBER: | MARKED FOR IDENTIFICATION |
|---|---|
| Deposition Exhibit No. 1 | 9 |
| Deposition Exhibit No. 2 | 12 |
| Deposition Exhibit No. 3 | 22 |
| Deposition Exhibit No. 4 | 47 |
| Deposition Exhibit No. 5 | 87 |
| Deposition Exhibit No. 6 | 88 |
| Deposition Exhibit No. 7 | 91 |
| Deposition Exhibit No. 8 | 97 |
| Deposition Exhibit No. 9 | 107 |
| Deposition Exhibit No. 10 | 123 |
| Deposition Exhibit No. 11 | 137 |





PROCEEDINGS

WHEREUPON,

HOWARD GOLDBERG

having been called for examination by counsel for appellant and having been duly sworn by the notary, was examined and testified as follows:

MS. WHITE: Can I just add to the record that I'll reserve objections just to form or confidentiality.

MS. GORDON: Okay. And I would also like to say for the record that I, Raquel Gordon, the pro se appellant, will be referring to myself as Ms. Gordon.

EXAMINATION BY COUNSEL FOR THE APPELLANT

Q Good morning, Mr. Goldberg.

A Good morning.

Q Could you please say your name for the record?

A Howard Goldberg.

Q Okay. And could you please tell me your educational background?

A I have a bachelor of science in engineering mechanics from Penn State University.

Q Do you have any additional background?

A No formal education additionally.

Q Do you have any human resources background?

A I don't know what you mean by human resource background.



Q Have you ever been trained in Merit System Principles?

A I attended numerous training classes offered to supervisors, yes.

Q Are you certified in Merit System Principles training?

A Not that I know of.

Q Okay. Can you please explain what you do at the Patent Office?

A I am the acting CFO of the Patent Office.

Q Okay.

A I'm responsible for all aspects of budget, finance, and procurement, corporate planning, strategic planning. I guess that pretty much sums it up.

Q Okay. And at one point were you a group director?

A Yes, I was.

Q For how long?

A Possibly five years.

Q Okay. Could you tell me the dates, please?

A I think it was July 2000 to June of 2005.

Q And for what group were you a group director?

A Tech Center 2800.

Q And was Ms. Gordon in your tech center at that time?

A Yes, you were.



Q And do you remember the time that you were group director, were there -- where was -- when you first became group director where was the office located?

A Crystal City.

Q And at the period that you were -- that you left being group director where was the office located?

A Alexandria.

Q Okay. Can you explain -- is any of the office still located in Crystal City?

A Yes.

Q Are there examiners working in Crystal City?

A No.

Q During the period between the offices being in Crystal City and Alexandria have any examiners been in Crystal City and Alexandria at the same time?

A No, the examiner only had one office either in Crystal City or they were moved to Alexandria.

Q Have any technology centers been in Crystal City and technology centers been in Alexandria during the same period?

A There was a transition, yes.

Q And during that transition is it true that business was ongoing in Crystal City?

A I don't know what you mean by business.

Q Were there still technology centers operating in

Page 30

no longer be an error, it would be a factual determination that it was not an error.

Q So, you're saying that there's no subjective -- there's no such subjectivity required by the supervisor in determining if the examiner has stated their case?

A I believe it's very objective, not subjective. Either it is or is not correct.

Q Okay. Is any supervisory judgment involved with regard to reviewing the references?

A I don't -- I guess I don't understand what the question is.

Q In determining if something is an error does it involve reviewing the reference, the patent reference, in comparison to the application patent claim?

A In reviewing an action you usually review -- you may review the reference applied by the examiner. It depends what the action is. It depends what the alleged error is.

Q So, you're saying there's -- are you saying there's absolutely no judgment involved with regard to determining if something is an error or not?

A It is always a judgment, but, I'm saying it is a factual determination. It either is or is not based on the merits of the action and what the specific details show.

Q So, you're --

Page 31

A I would need to see a specific case to determine that.

Q Okay. So, you're just -- is it true then that the supervisor judgment involves making a factual determination?

A The supervisor makes a factual determination. That is my statement.

Q Okay. And do you consider that to be judgment, a judgment determination making a factual determination?

A I don't know what the definition of judgment is so I can't answer that.

Q Okay. Can you give me a definition of judgment?

A Can I --

Q Yes.

A Not off the top of my head, no.

Q Do you believe a reasonable definition of judgment [illegible] utilizing one's skills and knowledge to make a [illegible]

A [illegible] that's what you say it is. I don't know. I [illegible] would know what the definition of judgment is at that [illegible]

Q Okay. I will give you a definition of judgment as [illegible] one's skills and knowledge to make a decision or [illegible]

A Okay.

Page 32

Q Okay. Based on my definition of judgment, do you believe that action taking, that rating and action taking element requires a supervisor's judgment?

A What's your definition again?

Q Requiring skills and knowledge in order to make a decision.

A Of course it does. You've got to have the skills and knowledge to make the decision.

Q Okay. And with regard to patentability determination, do you believe patentability determination requires skills and knowledge in order to make a decision?

A Absolutely.

Q Okay. And do you believe Mr. Meier exercised his skills and knowledge in order to make a decision with regard to Ms. Gordon's action taking element?

A Yes, I do.

Q And do you believe Mr. Meier exercised his skills and knowledge to make a decision with regard to exercise -- excuse me, let me rephrase that.

Do you believe Mr. Meier exercised his skills and knowledge to make a decision with regard to Ms. Gordon's patentability determination element?

A You mean, the rating of -- your rating in patentability determination?

Q Yes.

Page 33

A Yes, I do.

Q Okay. Are you familiar with any EEO actions that Ms. Gordon has claimed in the past?

A Vaguely.

Q Okay. Do you recall when that claim may have been made?

A No, not specifically.

Q Do you recall who that claim may have been made against?

A Yes. Some.

Q Could you please name the individual or individuals?

A I believe most recently you have filed a claim against myself, Peggy Focarino, Nancy Lee, John Barlow. There may have been others.

Q Okay. Are you familiar with a claim filed against Stephen Meier by Ms. Gordon?

A No, I don't recall that specifically.

Q Okay. Do you recall --

A Steve may also have been listed. I don't recall.

Q Do you recall in 2001 a claim being made against John Barlow for -- well, do you recall an EEO claim being made against John Barlow in 2001?

A Not specifically, no.

Q Okay. But, you did -- you do have knowledge that

there were -- there was EEO claims made in the past by Ms. Gordon against members of the agency?
A I just received a notice myself, so, yes, I am aware you have filed against members of the agency.
Q Okay. Is it a policy that if anyone is claiming EEO or grievance time they have to get approval from you before they can claim it?
A No.
Q Is it a policy that your supervisors have to get approval for you before they can allow examiners to claim EEO or grievance time?
A No.
Q Has Stephen Meier ever consulted with you with regard to Ms. Gordon's claims of grievance time?
A Grievance time?
Q Yes.
A I don't specifically recall.
Q Has Mr. Meier ever consulted with you with regard to Ms. Gordon's claims of EEO time?
A Yes.
Q And can you tell me when he consulted with you?
A No. I don't recall a specific date.
Q Do you recall the year that he consulted with you?
A Not specifically, no.
Q When did Mr. Meier become a supervisor under your



chain of command?
A 2003, maybe.
Q Okay. And has he indicated to you since 2003 that Ms. Gordon has asked for EEO time?
A I believe so, yes.
Q Okay. And do you recall if in 2004 he indicated that Ms. Gordon asked for EEO time?
A I don't recall exactly when we had the conversation.
Q Okay. So, at least sometime since 2003 you've been aware that Ms. Gordon has asked for EEO time?
A Yes.
Q Has Ms. Gordon ever made you aware that she was having issues involving equal employment opportunities?
A I don't recall whether you specifically talked to me about that or not.
Q Okay. Has any other employee under Mr. Meier ever indicated to you that they were having problems with equal employment opportunities?
A I don't believe so.
Q Okay. Are you familiar with examiner Charles Stewart?
A Yes.
Q Did Mr. Stewart ever indicate to you that he was having difficulties with Mr. Meier under his equal



employment opportunity rights?
A I'm not the person that you would file that complaint with. I believe he said something to me at one time, but, I don't know when. I advised him to go to the Office of Civil Rights if he was going to file a complaint.
Q Okay. And, so, when you determined that multiple individuals are asking for EEO time or have indicated to you that they have a problem with a supervisor that involves their equal employment opportunity rights do you generally investigate into that?
A It's not my job to do that investigation.
Q After becoming aware of the request for EEO time or after becoming aware that there are some issues with EEO protection did you counsel the supervisor?
A I was never made aware that there were actual issues that supervisor -- what supervisor are you talking about?
Q I'm talking about Stephen Meier.
A I have never been made aware that Mr. Meier has actually conducted or been found guilty of violating anybody's rights.
Q Well, actually that's a little bit jumping the gun. I'm just wondering if when you became aware of an initial complaint did you counsel Mr. Meier in order to investigate as to why those complaints were being made?



A I already answered that question. It is not my job to conduct an investigation into those complaints.
Q Okay. Did you report the complaints to the proper investigative authority?
A I already answered it is not my job to report them to the investigatory body.
Q Okay.
A It is the employee's job to do that.
Q Okay. What is your job with regard to when those complaints are received?
A Just to acknowledge and note them. I'm not even made aware formally that they are viable. I don't have to be made aware. That is a private matter.
Q Okay. Do you have any policy with regard to how to handle situations involving violations of EEO rights within your technology center, or, did you have any policy at the time you were director within that technology center?
A I have never had a violations found -- I have never had any charges substantiated so I am not aware of any real policies.
Q I understand that you've never had any charges substantiated, but, isn't it true that you've had numerous complaints?
A That I have had numerous complaints?
Q That you have entertained numerous complaints from